GALYEN PETROLEUM COMPANY, A CORPORATION, APPELLEE, V. FRANK SVOBODA AND KAY SVOBODA, HUSBAND AND WIFE, APPELLEES, FIRST NATIONAL BANK, O'NEILL, NEBRASKA, APPELLANT.

383 N.W.2d 49

Filed March 14, 1986.   No. 85-641.

William W. Griffin, for appellant.

John M. Gerrard of Domina & Gerrard, P.C., for appellee Galyen Petroleum Company.

KRIVOSHA, C.J., BOSLAUGH, WHITE, HASTINGS, CAPORALE, SHANAHAN, and GRANT, JJ.

KRIVOSHA, C.J.

This appeal involves the interpretation of the Nebraska petroleum products lien statutes, Neb. Rev. Stat. §§ 52-901 to 52-904 (Reissue 1984). Appellee Galyen Petroleum Company sold petroleum products to Frank Svoboda in 1984 for use in producing popcorn being raised by Svoboda. When Svoboda failed to pay Galyen for the petroleum, Galyen perfected a petroleum products lien on all the popcorn produced by Svoboda, in accordance with § 52-901, which provides:

> Any person who furnishes gasoline, diesel fuel, tractor fuel, oil, grease, or other petroleum products to another to be used in farm machinery for power or lubricating purposes in the production of any agricultural crop shall be entitled to a lien upon all such crops produced and owned by the person to whom such fuel or lubricant had been furnished to secure the payment of the purchase price thereof, upon compliance with the provisions of sections 52-901 to 52-904.

There appears to be no question that Galyen complied with the provisions of § 52-902, which provides:

> Within six months after the fuel or lubricant, referred to in section 52-901, has been furnished, the person selling such fuel or lubricant shall file with the clerk of the county in which the crop, referred to in section 52-901, is produced a verified notice of such lien, which notice shall show (1) the name and address of the person claiming the lien, (2) the name of the person to whom such fuel or lubricant has been furnished for use in farm machinery in the production of crops, (3) a description of the land upon which such crop or crops were grown, (4) the amount of

fuel or lubricant furnished, and (5) the amount due for furnishing such products. The fee for filing, amending, or releasing such lien shall be the same as set forth in section 9-403, Uniform Commercial Code.

At some point after perfecting its lien, Galyen initiated foreclosure proceedings. After the foreclosure action was commenced but before the case came to trial, appellant, First National Bank of O'Neill, Nebraska, entered into an agreement with Svoboda whereby First National purchased from Svoboda all of his inventory of popcorn, including that upon which Galyen had filed its petroleum lien. In consideration for the sale of the popcorn by Svoboda to the bank, First National agreed to credit Svoboda's debt to First National, then amounting to some $1.6 million. After purchasing this popcorn First National made effort to take possession and control of the popcorn by placing a lock on the bin mechanisms wherein the popcorn was stored. Galyen claims to have done likewise.

The primary issue presented to the district court was an interpretation of § 52-903, which reads in part as follows:

From and after the date of filing of the notice provided for in section 52-902, the claimant shall have a lien upon the crops produced and owned by the person to whom the fuel or lubricant, referred to in section 52-901, had been furnished to the amount of the purchase price of such fuel or lubricant so sold to such person. In the event the person to whom such fuel or lubricant was furnished desires to sell or deliver any portion of the crop so produced, such person so desiring to sell or deliver the same shall notify the consignee or purchaser that such petroleum bill has not been paid. Such lien shall shift to the purchase price thereof in the hands of the purchaser or consignee above mentioned in this section.

There appears to be no dispute that First National was advised by Svoboda of Galyen's lien. The specific question, then, is whether Galyen's lien remained on the popcorn once purchased by First National or transferred to the purchase price. The district court found that the lien remained on the popcorn and that Galyen was entitled to foreclose on its lien on the popcorn in the possession of First National. First National,

on the other hand, argues that the lien, by the language of the statute, did shift to the purchase price in the hands of First National. However, since that "purchase price" was the forgiveness of a debt, there was no money in the hands of First National for the lien to attach to, and, therefore, Galyen's only remedy is to sue Svoboda and thereby attempt to recover the money from Svoboda. In fact, we believe that neither party is correct, and, for that reason, we must reverse the judgment and remand this action.

The language of § 52-903 is clear and unambiguous. Where the words of the statute are plain, direct, and unambiguous, no interpretation is needed to ascertain the meaning, and the words used must be given their ordinary meaning. See, *Cohee v. Cohee*, 210 Neb. 855, 317 N.W.2d 381 (1982); *O'Neill Production Credit Assn. v. Schnoor*, 208 Neb. 105, 302 N.W.2d 376 (1981).

Section 52-903 clearly provides that the lien shall shift to *the purchase price thereof in the hands of the purchaser*. In the instant case that means the purchase price in the hands of First National became subject to the lien of Galyen before First National did anything with the purchase price. First National's obligation, therefore, was to first pay to Galyen the moneys due to Galyen and then either pay the balance to Svoboda or credit his account. Galyen has no obligation to pursue Svoboda but, rather, under the clear meaning of § 52-903, First National had a duty to withhold and pay to Galyen the amount of its lien before paying the balance to either Svoboda or to his credit.

First National argues, apparently, that because the consideration for the popcorn was the crediting of the debt owed by Svoboda to First National, there is no money upon which the lien could attach. This, of course, is not true. The question which we must ask is not whether there was any money paid to Svoboda but, rather, what was the *purchase price*. We believe the evidence discloses that the *purchase price* was $1.6 million. That it was paid by First National through the process of crediting Svoboda's debt to the bank does not change the fact that there was a purchase price of $1.6 million or that Galyen's lien attached to it while "in the hands of the purchaser." Purchase price, under § 52-903, means more than money and

may include credits applied to a debt.

In the early case of *Schrandt v. Young*, 62 Neb. 254, 265-66, 86 N.W. 1085, 1089-90 (1901), we said:

> Counsel contend, however, that an agister's lien existed only as to certain of the sheep subsequently delivered to be kept at an agreed price in money. The statute providing for an agister's lien does make use of the words "contract price," and the word "price" in ordinary parlance undoubtedly refers to money. But this is not controlling. Contracts like the one in question have always been considered agistment contracts equally with those where a money compensation was agreed on. *Bass v. Pierce*, 16 Barb. [N.Y.], 595. The reason of the law extends to all contracts of agistment, whether for money or some other valuable consideration, and the words in the context, "procure, contract with or hire," indicate no intention to restrict the benefit of the statute to agisters for a money consideration. Moreover, the word "price" does not invariably refer to money, but may mean reward or compensation generally. In *Hudson Iron Co. v. Alger*, 54 N.Y., 173, the court said: "It is said further, that the words 'price' and 'vendee' used in the statute imply a sale for money. It is true that 'price' generally means the sum of money which an article is sold for; but this is simply because property is generally sold for money, not because the word has necessarily such a restricted meaning. * * * The Latin word from which price is derived, sometimes means 'reward,' 'value,' 'estimation,' 'equivalent,' and Webster shows that it is sometimes used in the same sense; and I can not doubt that it was used in this statute in the sense of 'value' or 'compensation.' There is just as much reason for applying the rule of the statute to this case as to one where the sale was for a money price; and it is right to assume that congress meant to apply the rule to every case wholly within the reason of the rule, unless the language used clearly forbids it." In an English statute the word "price" received a like construction in a connection very like that here in question. *London & Yorkshire Bank v. Belton*, 15 Q. B. Div. [Eng.], 457. It is no reason for

denying the protection of the statute to this contract, that the compensation was to be made out of the wool and the increase of the flock, and not in money.

In *Schrandt*, had we held otherwise, the very purpose of the act would have been defeated. Likewise, were we to hold otherwise here, the purpose of the petroleum products lien would be defeated.

Whether First National chooses to pay Svoboda by check, which is then endorsed back to First National, or chooses to pay Svoboda by merely entering a debit and credit on its books is of no consequence to Galyen, nor does it change the act. The fact is that First National purchased the popcorn from Svoboda for $1.6 million, for which it paid by a credit on its books. Before it could apply that credit, however, the lien held by Galyen attached instantly to the purchase price in its hands, and Galyen was entitled to receive from First National payment sufficient to satisfy its lien; the balance, if any, then to be applied to Svoboda's debt to First National. For that reason the decision of the district court must be reversed and the cause remanded with directions to enter judgment in favor of Galyen and against First National for the amount of its lien, which First National is obligated to pay.

REVERSED AND REMANDED WITH DIRECTIONS.